***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendants.
3. American Motorists Insurance Company is the carrier on risk.
4. The maximum workers' compensation rate for 1999 was $560.00.
5. Plaintiff last worked for defendants on August 6, 1999.
6. Plaintiff seeks no benefits prior to January 1, 2000.
7. Plaintiff alleges that by August 6, 1999 he contracted the compensable occupational diseases of bilateral rotator cuff tear, biceps tendon tear, labral tear, impingement syndrome, and rotator cuff tendonitis.
8. Defendants denied plaintiff's claim for compensation.
9. The following exhibits were entered into the evidence of record at the hearing before Deputy Commissioner Jones:
a. Stipulated Exhibit #1-plaintiff's medical records
b. Stipulated Exhibit #2-physical therapy records
c. Stipulated Exhibit #3-NCIC forms and filings
d. Plaintiff's Exhibit #1-work history
e. Plaintiff's Exhibit #2-job description statement
f. Plaintiff's Exhibit #3-brass ring
g. Plaintiff's Exhibit #4-brass cup
h. Plaintiff's Exhibit #5-videotape
i. Plaintiff's Exhibit #6-W-2 Forms for 1997, 1998, 1999
j. Plaintiff's Exhibit #7-plaintiff's answers to interrogatories
k. Plaintiff's Exhibit #8-plaintiff's supplemental responses
l. Plaintiff's Exhibit #9-whole application, Loomis Fargo
m. Defendants' Exhibit #1-Fannie Mae application
n. Defendants' Exhibit #2-disability application
o. Defendants' Exhibit #3-application
p. Defendants' Exhibit #4-pension plan summary
q. Defendants' Exhibit #5-8/9/02 letter from Central States
r. Defendants' Exhibit #6-job function description
s. Defendants' Exhibit #7-9/2/02 appeal letter
t. Defendants' Exhibit #8-DOT Physical Exam Report
u. Defendants' Exhibit #9-denial memo
10. The issues before the Commission are: (I) whether plaintiff contracted the compensable occupational diseases of bilateral rotator cuff tear, biceps tendon tear, labial tear, impingement syndrome and rotator cuff tendonitis arising out of and in the course of his employment with defendants; (ii) if so, what compensation, if any, is due plaintiff; (iii) whether plaintiff refused to accept suitable employment, precluding him from receiving workers' compensation benefits; (iv) whether plaintiff's retirement benefits should be considered income in determining plaintiff's eligibility for benefits; and (v) if plaintiff's occupational diseases are barred by applicable statute of limitations.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 57 years old and had earned a GED in 1976 at Forsyth Technical College.
2. During the period of 1964 through 1970, plaintiff worked as a laborer in a variety of jobs.
3. On February 2, 1970, plaintiff was employed by Schlitz Brewery to work as a production employee at its brewery located in Winston-Salem.
4. In 1976, plaintiff was transferred to the brewing department where he worked as a brewer or laborer until August 6, 1999. The Winston-Salem brewery was closed on that date and its employees laid off.
5. In 1986, Stroh Brewing Company succeeded Schlitz at the Winston-Salem brewery and became plaintiff's employer.
6. Plaintiff's job duties for defendants involved hard, demanding physical labor consisting of standing and walking and using his hands and arms to lift heavy objects weighing up to 75 pounds. During the majority of plaintiff's 23 year career with defendants, plaintiff worked at least 7 hours a day, at least 5 days a week, for at least 42 weeks per year.
7. Plaintiff helped bring beer throughout the network of stainless steel pipes and filters from the cellar to be prefilled, final filtered, and then pumped out to the government cellar as its final destination before being packed.
8. Plaintiff spent approximately three hours of each workday removing, changing and replacing elbows, which connected the pipes. Each of the elbows weighed approximately 10 to 30 pounds. Each elbow was rounded on the end with the body being different lengths. Elbows had brass fittings on either end. Each brass fitting had a 2 or 3 inch ear or projection on either side across from each other.
9. Plaintiff used his hands and arms to remove, change or hook up the brass fittings on the elbows to the stainless steel outlet and inlet pipes. For each prefilter and final filter, elbows were used. Plaintiff spent approximately an hour per workday using his arms and hands above his head to remove, change or hookup the brass fittings on the elbows of the pipes.
10. The types of beer running through the pipes frequently changed during the day. Each product change required some elbows to be changed.
11. Plaintiff's primary responsibility as brewer was to filter and prepare beer to be sent to the packaging department for bottling.
12. Brass fittings were very difficult to take on and off. In order to change the fitting, plaintiff used a solid brass cap which weighed about eight pounds to beat or hammer the ears on each brass fitting so as to tighten or loosen the brass fitting on or off the steel inlet or outlet pipe. Plaintiff usually made about 8 or 10 hammering strokes raising his right arm and holding the brass cap above his head and then lowering his right hand and then using both hands with as much force as he could to strike the brass cap against the ears of the brass fitting to loosen or tighten the brass fitting connected to the pipe.
13. Plaintiff sometimes used heavy hoses with brass fittings on the end to connect to the stainless steel pipes. Plaintiff used his arms above his head to swing the same brass metal cap or to beat or hammer the ears on brass fittings on hoses to connect the stainless steel inlet and outlet pipes. Plaintiff used his arms above his chest to lift one end of the heavy hoses on either shoulder and then drag the hoses in the inlet or outlet pipe location.
14. Plaintiff's work for defendants required constant physical motion using his hands and arms and lifting and overhead work. Plaintiff worked with fittings and other pieces of equipment that weighed various amounts.
15. James L. Balance, plaintiff's supervisor from 1993-1999, testified that plaintiff was a hard worker and that he had never known plaintiff to be dishonest.
16. In 1998, plaintiff earned gross wages of $43,274.44. In 1999, plaintiff earned gross wages of $53,651.92, which included $10,248.00 in severance pay.
17. On August 6, 1999 defendants closed the Winston-Salem brewery and the workers, including plaintiff, were laid off.
18. In the 52 week period from August 7, 1998 through August 6, 1999, plaintiff earned gross wages from defendants in the amount of $60,761.44 yielding an average weekly wage of $1,168.49, entitling plaintiff to the maximum compensation rate of $560.00 for the year 1999.
19. Plaintiff received severance pay and unemployment compensation from August 6, 1999 until October 31, 1999.
20. Since November 1999 plaintiff has received pension or retirement benefits of $3,000.00 per month from Central States Pension Fund.
21. In early 1998, plaintiff began having bilateral shoulder pain. By early 1999, plaintiff noticed significant pain in his shoulders, right worse than the left. Plaintiff continued to perform his work duties with defendants despite his shoulder pain because he believed the pain would improve once defendants closed the brewery in August 1999 and he stopped performing the duties.
22. Plaintiff's pain and weakness in his shoulders continued to worsen after he was laid off on August 6, 1999. Plaintiff has had consistent shoulder pain since January 1, 2000 which worsened with arm activity, particularly any movement of either arm away from the body, and which plaintiff testified interfered with his ability to pay attention to what he was doing.
23. Despite plaintiff's testimony at the Deputy Commissioner hearing concerning his continued shoulder pain, he did not seek treatment for his shoulders until February 2, 2001, when he sought medical attention from his family physician, Dr. John B. Thomas. Plaintiff complained of gradual shoulder pain and no known specific triggering event. Dr. Thomas referred plaintiff to Dr. Michael King.
24. Dr. King evaluated plaintiff on March 5, 2001. Plaintiff complained to Dr. King of bilateral shoulder pain that started when he was working for defendants. After the evaluation, Dr. King diagnosed plaintiff with bilateral rotator cuff tears, right worse than left, for which he recommended arthroscopy surgery. Plaintiff did not have the financial ability to pay for shoulder surgery in March 2001.
25. On March 5, 2001, Dr. King indicated to plaintiff that his shoulder problems were probably caused by his job duties with defendants. This was the first time plaintiff was advised by competent medical authority that his shoulder conditions were work-related. Plaintiff did not know how to contact defendants to file a workers' compensation claim. In March 2001 and thereafter defendants had no representative, manager or official in North Carolina to whom plaintiff could have written or given oral notice of his claim for benefits concerning injuries to his shoulders.
26. Plaintiff searched the Internet for defendants' mailing address, which he discovered by June 20, 2001 was 100 River Place Drive, #100, Detroit, Michigan 48207. On June 20, 2001 plaintiff mailed a copy of a Form 18 Notice of Accident to defendants at this address.
27. On June 25, 2001, the North Carolina Industrial Commission received plaintiff's Form 18 and correspondence detailing his workers' compensation claims against defendants. Plaintiff claimed his job duties caused him to injure his shoulders and prevented him from being able to do any kind of work with his arms.
28. The Full Commission finds plaintiff's failure to provide written notice of his workers' compensation claim to defendants prior to June 20, 2001 was reasonable under the circumstances in that plaintiff did not know where to contact defendants due to the closing of the brewery in August 1999 and defendants were no longer located in this State. Based on these circumstances, defendants were not prejudiced as a result of plaintiff's failure to notify defendants of his claims within 30 days after his being advised by physicians as to the work-related condition of his shoulders on March 5, 2001.
29. On March 18, 2002, over a year since his last visit with Dr. King, plaintiff sought treatment from Winston-Salem Orthopaedic Group. Dr. Gary G. Poehling saw plaintiff for bilateral shoulder pain that plaintiff had since 1998. Plaintiff complained that he was unable to use his arms to work due to the severe pain. Dr. Poehling diagnosed bilateral shoulder impingement syndrome, right worse than left and recommended arthroscopic surgery on the right shoulder to be followed by the left shoulder surgery.
30. Dr. Poehling felt plaintiff was at an increased risk of developing shoulder impingement syndrome, rotator cuff tendonitis, a bicep tendon tear and a labral tear as compared to members of the general public because of his work activities with defendants.
31. On August 2, 2002, plaintiff successfully passed a medical examination by Dr. Thomas O'Meara to receive a commercial drivers license. Dr. O'Meara felt plaintiff was capable of performing job requirements to work for Loomis Fargo as a commercial driver.
32. In August 2002, Loomis Fargo conditionally offered plaintiff a job as an armored service technician. The greater weight of the evidence concerning the job description and responsibilities shows that the duties of the armored service technican position exceeded plaintiff's capabilities in that the job required repeated heavy lifting and carrying items in an unrestricted manner, as well as the use of a .38 revolver. Plaintiff justifiably did not accept this job offer.
33. On October 9, 2002, Dr. Poehling operated on plaintiff's right shoulder to repair complete thickness tears of plaintiff's rotator cuff, biceps tendon tear, a labral tear and shoulder impingement. This surgery provided plaintiff with some relief and plaintiff participated in physical therapy for his right shoulder for about 8 weeks after the surgery.
34. Despite the therapy and the surgery, plaintiff continued to have moderate to severe right shoulder pain and weakness. Plaintiff experienced pain and weakness with any movements from his dominant right arm away from his body. Dr. Poehling felt there was a valid medical reason plaintiff continued to experience shoulder pain and weakness.
35. On May 21, 2003, Dr. Poehling performed arthroscopic surgery on plaintiff's left shoulder to repair large complete thickness rotator cuff tears and partial thickness bicep tendon tear with subacromial space narrowing due to the rotator cuff impingement.
36. Following the surgery, Dr. Poeling felt plaintiff was not capable of returning to any employment. Plaintiff reached maximum medical improvement with respect to his right arm but had not reached maximum medical improvement to his left.
37. Plaintiff saw Gary L. Sigmon, a vocational consultant, on April 14, 2003. Mr. Sigmon evaluated plaintiff's work history, education, and current physical limitations and determined it was highly unlikely plaintiff would be able to find suitable employment.
38. Mr. Sigmon felt plaintiff would not be able to return to work as a brewer. Plaintiff's pain interfered with his ability to concentrate and that, coupled with his physical limitations, prevented him from seeking most types of work.
39. Mr. Sigmon recommended plaintiff be given a functional capacity evaluation to assess plaintiff's skill level.
40. The Full Commission finds based upon the greater weight of the medical evidence that plaintiff developed the occupational diseases of right rotator cuff tears, right rotator cuff tendonitis, a right bicep tear, right labral tear and right shoulder impingement as a result of his employment duties with defendants.
41. The Full Commission finds based upon the greater weight of the medical evidence that plaintiff developed the occupational diseases of left shoulder rotator cuff tears, partial tear to his left bicep tendon, and left shoulder impingement as a result of his employment duties with defendants.
42. The Full Commission finds by the greater weight of the evidence that plaintiff's employment with defendants placed him at an increased risk for acquiring and developing the occupational diseases of right rotator tears, right rotator cuff tendonitis, a right bicep tendon tear, right labral tear, right shoulder impingement, left rotator cuff tears, partial tear of the left bicep tendon, and left shoulder impingement as compared to the members of the general public not so employed.
43. The Full Commission finds plaintiff's period of disability began on October 9, 2002. Up until this time no physician took plaintiff out of work, plaintiff applied for only two jobs between January 1, 2000 when his unemployment benefits ended and October 9, 2002 when surgery was performed, and there is no evidence that it would be futile for plaintiff to look for work. Plaintiff has been unable to earn any wages in the same or any other employment since October 9, 2002 as result of his compensable occupational diseases.
44. The evidence of record fails to show that defendants are entitled to a credit for the pension benefit paid plaintiff by Central States Pension Fund, which is not disability compensation, but rather a retirement benefit. Further, there is no evidence of record that the pension benefits are funded by defendant-employer or that defendant-employer has paid or is paying any type of disability benefits to plaintiff.
45. Plaintiff would benefit from a functional capacity examination to determine plaintiff's current physical status.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's contraction and development of the occupational diseases of right rotator cuff tear, right rotator cuff tendonitis, right bicep tendon tear, right labral tear, right shoulder impingement, left rotator cuff tear, partial tear of the left bicep tendon, and left shoulder impingement are due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendants. Plaintiff's shoulder conditions are not diseases of life to which the general public not so employed are equally exposed and therefore occupational diseases. N.C. Gen. Stat. § 97-53(13); Booker v. Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979).
2. Plaintiff's contraction of the occupational diseases was denied by defendants and therefore no presumption of disability arises in favor of plaintiff. Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277, disc. rev. denied,353 N.C. 729, 550 S.E.2d 782 (2001). Plaintiff retains the burden of proof with respect to continuing disability. Id.
3. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury or occupational disease. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may prove disability by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injuryor occupational disease, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of pre-existing conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 535 S.E.2d 485, aff'd percuriam, 354 N.C. 355, 554S.E.2d 337 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v.Perdue Farms, Inc., supra.
4. In the case before us, the greater weight of the evidence of record fails to show that plaintiff was disabled during the period from the date he was laid off, August 6, 1999, until his first surgery on October 9, 2002. During this period, no doctor took plaintiff out of work, plaintiff was capable of some work but did not make a reasonable effort to look for work, and there is insufficient evidence of record that it would be futile for plaintiff to seek employment. N.C. Gen. Stat. § 97-2(9); Russellv. Lowes Product Distribution, supra.
5. Plaintiff has been totally disabled due to his compensable occupational diseases since his first surgery on October 9, 2002 and is entitled to receive total disability compensation at the rate of $560.00 per week beginning October 9, 2002 and continuing until further Order of the Commission. N.C. Gen. Stat. §§ 97-2(9);97-29.
6. Plaintiff was first advised by Dr. King on March 5, 2001 concerning the work-related nature of his shoulder conditions. Plaintiff's failure to provide defendants written or oral notice prior to June 20, 2001 is reasonable based upon the facts that defendants were no longer located in the State and therefore plaintiff did not know how to notify defendants. N.C. Gen. Stat. §§ 97-58; 97-22.
7. Defendants are not entitled to a credit for the pension benefits plaintiff receives from Central States Pension Fund. N.C. Gen. Stat. § 97-42; Heffner v. Cone Mills Corp.,83 N.C. App. 84, 349 S.E.2d 70 (1986).
8. Plaintiff is entitled to medical compensation, including a functional capacity evaluation, for his compensable occupational diseases so long as such treatment effectuates a cure, gives relief or lessens plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-59.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. For his total disability, plaintiff is entitled to total disability compensation from October 9, 2002 and continuing until further Order of the Commission. Said compensation shall be paid at a rate of $560.00 a week. subject to an attorney's fee approved in Paragraph 3.
2. Defendants shall pay all medical expenses resulting from plaintiff's contraction of the occupational diseases, which shall include treatment provided by plaintiff's treating physician, Dr. Poehling.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: 25% of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. In regards to future compensation, plaintiff's counsel shall be entitled to the equivalent of every fourth check.
4. Defendants shall pay for a functional capacity evaluation for plaintiff.
5. The issue of plaintiff's permanent functional impairment, if any, as a result of the compensable occupational diseases is reserved for future determination by the Commission, in the event the parties are unable to agree on this issue.
6. Defendants shall pay the costs.
This the ___ day of April 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd